**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: swestcot@bursor.com
       sbeck@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARKHAN NABI, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>ROBINHOOD FINANCIAL, LLC, a Delaware LLC, and ROBINHOOD SECURITIES, LLC, a Delaware LLC,<br><br>          Defendants. | Case No. <br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Sarkhan Nabi ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Robinhood Financial, LLC ("Robinhood Financial") and Robinhood Securities, LLC ("Robinhood Securities") (collectively, "Defendants" or "Robinhood") for material misrepresentations and omissions by Robinhood relating to its revenue sources, statements concerning the execution quality Robinhood achieved for consumers' orders, and Robinhood's failure to satisfy its duty of best execution.

2.      Robinhood is a multi-billion dollar online brokerage firm founded in 2013.  In order to distinguish itself from competitors, Robinhood engaged in an aggressive marketing campaign promoting its "commission free trading."  This purported advantage, however, came with a catch: Robinhood's customers, such as Mr. Nabi, received inferior execution prices compared to what they would have received from Robinhood's competitors.  In fact, the difference in execution price typically exceeded the commission Robinhood's competitors would have charged.

3.      Robinhood engaged in this deceptive campaign while failing to disclose its inferior execution prices to consumers.

4.      Plaintiff brings this action on behalf of himself and the putative class against Defendants for: (1) Violations of California Consumers Legal Remedies Act ("CLRA"), Civil Code § 1750, *et seq.*; (2) Violations of California Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*; (3) Violations of California False Advertising Law ("FAL") Bus. & Prof. Code § 17500, *et seq.*; (4) Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (5) Negligent Misrepresentation; (6) Breach of Implied Covenant of Good Faith and Fair Dealing; and (7) Breach of Fiduciary Duty.

5.      Plaintiff seeks an order for relief including, but not limited to, the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the putative Class; (2) enjoining Defendants from further legal violations through Robinhood's payment for order flow

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

1  collection scheme; and (3) requiring Defendants to publicly correct the false and misleading

2  statements and omissions alleged herein.

3  **THE PARTIES**

4      6.      Plaintiff Sarkhan Nabi is a California resident who lives in Tarzana, California.  Mr.

5  Nabi resides in Tarzana and has an intent to remain there and is therefore a domiciliary of

6  California.  Mr. Nabi opened an account with Robinhood in 2017.  The primary reason Mr. Nabi

7  chose Robinhood over its competitors was due to their advertised commission free trading.  Since

8  2017, Mr. Nabi has engaged in hundreds of trades, investing tens of thousands of dollars into his

9  Robinhood account.  Currently, Mr. Nabi's account balance stands at approximately $105,000.00.

10  Due to Defendants' misleading statements and omissions, Mr. Nabi was completely unaware that

11  Robinhood was executing trades at inferior prices compared to its competitors.  Had Robinhood

12  disclosed this practice to Mr. Nabi he would not have chosen to open an account with Robinhood,

13  nor would he have engaged in any trades with Robinhood.

14      7.      Defendant Robinhood Financial, LLC is a Delaware LLC with its principal place of

15  business located at 85 Willow Road, City of Menlo Park, California.

16      8.      Defendant Robinhood Securities, LLC is a Delaware LLC with its principal place of

17  business located at 85 Willow Road, City of Menlo Park, California.

18  **JURISDICTION AND VENUE**

19      9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

20  because this case is a class action where the aggregate claims of all members of the proposed class

21  are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the

22  proposed class is citizen of state different from Defendants.

23      10.      This Court has personal jurisdiction over Defendants because they are headquartered

24  in this District, and many of the acts and transactions giving rise to this action occurred in this

25  District.

26      11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts

27  and transactions giving rise to this action occurred in this District, and because Defendants reside in

28  this District.

## STATEMENT OF FACTS

### *Background*

12.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications.  Robinhood is a Commission-registered broker-dealer and a member of Financial Industry Regulatory Authority ("FINRA").  Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities.  Beginning in November 2019, Robinhood began sending all customer orders for trade execution to Robinhood Securities.  When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.

13.     Robinhood was founded in 2013 and began offering retail brokerage accounts to the general public in March 2015.  Robinhood distinguished itself from other retail-oriented broker dealers by, among other things, allowing customers to place orders to buy and sell securities without paying a trading commission.  It was this price-value proposition that allowed Robinhood to grow rapidly.

14.     By June 2019, Robinhood had 9 million approved customer accounts.

### *Principal Trading Firms And Payment For Order Flow*

15.     Rather than sending customer orders to buy or sell equity securities directly to national exchanges, Robinhood, like other retail broker-dealers, routed its orders to other broker-dealers (often referred to as "principal trading firms" or "electronic market makers") to either execute those orders or route them to other market centers.

16.     Principal trading firms attempt to profit from executing large volumes of retail buy and sell orders either by taking the other of customer orders and exiting the positions at a profit, which is known as "internalization," or by routing the orders to other market centers.

17.     Principal trading firms offer incentives to retail broker-dealers to send them order flow.  One such incentive is "payment for order flow," which is defined in Rule 10b-10(d)(8) of the

Exchange Act to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders.

18.     Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers, has received payment for order flow in exchange for routing its customer orders to principal trading firms.

19.     SEC rules permit the receipt of payment for order flow by broker-dealers as long as it does not interfere with their efforts to obtain best execution, and as long as the routing of that order flow, as well as a description of all terms of any such arrangements that may influence the broker-dealer's order routing decision, are disclosed in quarterly reports filed pursuant to 17 CFR § 242.606 (Disclosure of order routing information, "SEC Rule 606").

20.     Another incentive that principal trading firms may provide to retail broker-dealers is "price improvement" on customer executions.  Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing on the public quotation feed, that is, by executing a "buy" order at a price lower than the lowest prevailing offer or executing a "sell" order at a price high than the highest prevailing bid.

21.     Price improvement creates a direct financial benefit for the customer, since the customer receives a better price than he or she would have received had the order been executed at the national best bid and offer ("NBBO") on the public quotation feed.

22.     In practice, most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

### The Duty Of Best Execution

23.     Broker-dealers such as Robinhood owe their customers a duty of "best execution." Best execution requires that a broker-dealer endeavor to execute customer orders on the most

favorable terms reasonably available in the market under the circumstances.  This includes taking into account price, order size, trading characteristics of the security, as well as the potential for price improvement and other factors.  *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 & n.2 (3d Cir. 1998); *Marc N. Geman*, Securities Exchange Act Release No. 43963 (Feb. 14, 2001) (Commission Opinion).

24.     Although a broker-dealer is not required to examine every customer order individually for compliance with its duty of best execution, it must undertake regular and rigorous reviews of the quality of its customer order executions.  *See Payment for Order Flow*, Securities and Exchange Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed. Reg. 55006, at 55009 (Oct. 27, 1994) ("*Payment for Order Flow Release*").

25.     The duty of best execution derives from, among other sources, the common law agency duty of loyalty, which obligates an agent to act exclusively in the principal's best interest. Payment for order flow has the potential to create a conflict of interest between the broker-dealer and its customer because payment for order flow is a benefit that does to the broker-dealer itself, whereas other incentives that may be obtained for routing order flow, such as price improvement, benefit the broker-dealer's customers.  A broker-dealer must not allow payment for order flow to interfere with its efforts to obtain best execution.  *See Payment for Order Flow Release*, at 55009 & n.28.

### *Robinhood's Initial Public Messaging Concerning Payment For Order Flow*

26.     In 2014, prior to its public launch, Robinhood published an FAQ page on its website providing information about the company and its anticipated brokerage operations.  The first version of the FAQ disclosed that Robinhood anticipated receiving payment for order flow in its answer to the question "How does Robinhood make money?"

27.     Also, in 2014, a best-selling author published a book that chronicled various aspects of the electronic securities trading industry and portrayed payment for order flow as a controversial practice.[1]  Several other news organizations similarly published articles discussing payment for order flow and other issues concerning electronic trading venues.[2]

28.     Senior Robinhood personnel were aware of these publications and the ensuing controversy regarding payment for order flow and its association with principal trading firms (which were also sometimes referred to as "high frequency trading firms").  They became concerned that if the public associated Robinhood with payment for order flow and high frequency trading firms, it could be viewed as controversial by Robinhood's customers.

29.     In light of these concerns, in December 2014, Robinhood removed the reference to payment for order flow from its answer to the "How does Robinhood make money" FAQ and created a new FAQ page that specifically discussed payment for order flow.

30.     This new FAQ page stated that the payment for order flow revenue Robinhood received at the time was "indirect" and "negligible."  It also stated that if payment for order flow ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page.

31.     In the first quarter of 2015, Robinhood launched its trading platform to the public. Although the company's overall revenue was modest in 2015 through mid-2016, during that time payment for order flow comprised more than 80% of the company's revenue.

***Robinhood Received Unusually High Payment For Order Flow Rates And Failed To Conduct Rigorous Reviews Of Its Execution Quality***

32.     Initially, Robinhood relied on another broker-dealer to provide both clearing and

---

[1] https://www.pbs.org/newshour/show/flash-boys-investigates-high-frequency-traders-anticipate-wall-streets-next-move-faster.
[2] https://www.ft.com/content/97810c5e-fd1c-11e3-8ca9-00144feab7de.

order execution services for Robinhood customer orders.  That broker-dealer routed Robinhood customer orders to principal trading firms, received payment for order flow in return, and shared a portion of that payment for order flow with Robinhood.

33.     During the first half of 2016, Robinhood decided to start routing customer orders directly to principal trading firms and cease relying on the other broker-dealer for order execution routing services.  By doing so, Robinhood could earn additional payment for order flow revenue.

34.     On or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities.

35.     In the course of those negotiations, certain of the principal trading firms told Robinhood that there was a trade-off between payment for order flow on the one hand and price improvement on the other: If Robinhood negotiated for higher payment for order flow revenue, according to the principal trading firms, there would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

36.     At least one principal trading firm communicated to Robinhood that large retail broker-dealers that receive payment for order flow typically receive four times as much price improvement for customers as they do payment for order flow for themselves—an 80/20 split of the value between price improvement and payment for order flow.

37.     Robinhood negotiated a payment for order flow rate that was substantially and unusually higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow.  Robinhood explicitly agreed to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

38.     Robinhood intentionally omitted these details from its FAQ page.  As such, Robinhood customers were completely unaware of the unfavorable terms Robinhood negotiated with the principal trading firms.

39.     In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms.  Around the same time, Robinhood formed a "Best Execution Committee" to monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders.  The Committee met at least once per month and included Robinhood's General Counsel.  From October 2016 through at least June 2019, the Committee observed that Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

40.     Meanwhile, in 2017, Robinhood developed a proprietary routing algorithm, known as a smart order router, designed to make the principal trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the principal trading firm that had provided the most price improvement for that stock over the prior 30 days.  However, the smart order router did not address Robinhood's high payment for order flow rates or any potential execution prices that may be available at venues that did not agree to pay those rates.  Even with its smart order router, Robinhood customer orders received poor execution quality.

41.     Although Robinhood was on notice that its high payment for order flow rates could lead to less price improvement for its customers, the Best Execution Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations.  The Committee took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received.

42.     Until October 2018, the Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally.

43.     In mid-2017, when one of the principal trading firms to which Robinhood routed order flow told Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates, but would pay a lower payment for order flow rate, Robinhood stopped routing customer orders to that principal trading firm.

44.     When certain Robinhood personnel began comparing the firm's order execution quality to competitors in October 2018, they learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse.

45.     By March 2019, Robinhood had conducted a more extensive internal analysis, which showed that its execution quality and price improvement metrics were substantially worse than other retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price improvement, measured on a per order, per share, and per dollar traded basis.  Senior Robinhood personnel were aware of this analysis.

46.     However, Robinhood's Best Execution Committee did not take appropriate steps to assess whether, in light of this information, Robinhood was complying with its duty to seek best execution of customer orders.

47.     Robinhood's failure from October 2016 through at least June 2019 to conduct adequate, regular, and rigorous reviews that involved benchmarking its execution quality against competitor broker-dealers to determine whether it was obtaining the best terms reasonably available for customer orders, violated Robinhood's duty of best execution.

_**Robinhood Misleadingly Omitted Payment For Order Flow From Descriptions Of Its Revenue Sources**_

48.     By the end of 2016, Robinhood was generating a significant amount of revenue, the majority of which its controlling officers knew continued to come from payment for order flow. However, contrary to what the company had said in the payment for order flow FAQ, Robinhood did _not_ disclose the new payment for order flow arrangements in its answer to the "How Robinhood Makes Money" FAQ on its website.

49.     Instead, at some point during 2016, Robinhood deleted the payment for order flow FAQ.  Robinhood kept no records showing when the payment for order flow FAQ was deleted, why it was deleted, or who was responsible for approving its removal.

50.     Between late 2016 and September 2018, Robinhood continued to grow rapidly. Although payment for order flow remained the company's largest revenue source throughout this period, Robinhood did not include payment for order flow as a revenue source in its answer to the "How Robinhood Makes Money" FAQ on its website.

51.     The company failed to update the FAQ to include payment for order flow despite the fact that, in 2016 and 2017, the company did update the FAQ to include two other, smaller revenue sources: subscription-based memberships and interest on securities lending.  The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated:



52.     Robinhood kept incomplete records of its updates to the "How Robinhood Makes Money" FAQ page, including incomplete records of who was responsible for approving updates to that page.

53.     The "How Robinhood Makes Money" FAQ was featured in certain of Robinhood's customer communications.  From at least February 22, 2016 to October 26, 2017 Robinhood displayed a link to the "How Robinhood Makes Money" FAQ on the home page of its website:



54.     Moreover, Robinhood instructed customer service representatives to direct customers to the "How Robinhood Makes Money" FAQ page or use the language of the misleading FAQ answer when responding to general questions about how Robinhood made money.  Thus, in response to inquiries from its customers between 2015 and August 2018 about how Robinhood made money—approximately 150 inquiries in total—Robinhood's customer service representatives did not identify payment for order flow as one of the company's revenue sources.

55.     In fact, training documents for customer service representatives in early 2018 explicitly instructed them to "avoid" talking about payment for order flow and stated that it was

"incorrect" to identify payment for order flow in response to the question how Robinhood makes money.

56.     Throughout this period, Robinhood disclosed some information about its receipt of payment for order flow as required in SEC-mandated reports pursuant to Rule 606.  The company included these reports on the "Disclosure Library" page on its website that included a number of other legally-mandated disclosures.  However, the company did not feature the "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page.

57.     Robinhood's customer agreements and trade confirmations only stated that Robinhood "may" receive payment for order flow.

***Robinhood Falsely Claimed That Its Execution Quality Matches Or Beats That Of Its Competitors***

58.     In response to media reports in September and October 2018 about Robinhood's payment for order flow rates, Robinhood added payment for order flow to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ page.

59.     But on October 12, 2018, it also published a new FAQ page that discussed payment for order flow and Robinhood's order execution quality.  The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages."  It also cited one statistic related to execution speed and one statistic related to the percentage of orders for S&P 500 stocks executed within the NBBO:

**What is the execution quality for orders on Robinhood?**

Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

60.     However, the internal analyses referenced in the paragraphs above that Robinhood conducted in October 2018 and March 2019 showed that Robinhood's execution quality was worse than that of other large retail broker-dealers in many respects.  In particular, in October 2018, when certain Robinhood employees began gathering data to compare Robinhood's execution quality metrics to those of its competitors, other Robinhood personnel remarked that most of Robinhood's metrics were worse and discussed the execution quality metrics with certain senior Robinhood personnel.

61.     A more extensive analysis Robinhood conducted in March 2019 stated that "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin."  Robinhood further found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis.  Senior Robinhood personnel were aware of this analysis.

62.     For most orders of more than 100 shares, the analysis concluded that Robinhood customers would be better off trading at another broker-dealer because the additional price improvement that such orders would receive at other broker-dealers would likely exceed the approximately $5 per-order commission costs that those broker-dealers were then charging.

63.     The analysis further determined that the larger the order, the more significant the price improvement losses for Robinhood customers—for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares.

64.     Robinhood removed the claim about Robinhood's execution quality matching or beating that of other broker-dealers from its FAQ in June 2019, after staff from the Commission's Office of Compliance Inspections and Examinations raised concerns about that sentence.

65.     Between October 2016 and June 2019, certain Robinhood orders lost a total of approximately $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after netting the approximately $5 per-order commission costs those broker-dealers were charging at the time.

**_Plaintiff's Use Of Defendant's Services_**

66.     Plaintiff Sarkhan Nabi opened a Robinhood account in 2017.

67.     Plaintiff chose to open an account with Robinhood due to their advertisements promoting "commission free trading," which differentiated itself from competitors.

68.     Since 2017 Plaintiff has made hundreds of transactions through Defendant's platform.  Several of those transactions have included orders of over 100 shares.  Such purchases include shares of U.S. based exchange-listed stocks in trades executed at purported market prices.

69.     Plaintiff reasonably believed that each market order would be executed by Robinhood at the best available price.

70.     However, Robinhood's unusually high payment for order flow rates adversely impacted the execution quality of Plaintiff's and putative Class members' market orders and chances for price improvement.

71.     Plaintiff was unaware that Robinhood negotiated such unusually high payment for order flow rates because it did not make adequate disclosures on its website and mobile application. Had Plaintiff been aware of Robinhood's unusually high payment for order flow system he would not have chosen to invest tens of thousands of dollars through its investment platform.

72.     At all times relevant senior Robinhood personnel knew or should have known that their market orders were not being executed at rates comparable to its competitors.

73.     Defendants' knew or should have known that its advertisements offering "commission free trading" was deceptive under the circumstances due to Robinhood's unusually high payment for order flow rates.  Defendants' knew or should have known that its execution quality was so inferior it often times exceeded the commission rates charged by other broker-dealers for comparable market orders.

74.     Robinhood owes a duty to its account holders, like Plaintiff, a duty of best execution.

75.     Such acts by Robinhood violated its duty of best execution owed to its account holders.

76.     Due to Robinhood's payment for order flow system, Plaintiff and putative Class members suffered damages from Defendants' unlawful conduct and inferior execution quality.

## CLASS ALLEGATIONS

77.     Plaintiff brings this action on behalf of himself and as a representative of all similarly situated individuals pursuant to Fed. R. Civ. P. 23 and proposes the following Class definition: All persons within the United States who maintained a Robinhood account from September 1, 2016 through present who executed market orders for which Defendants received payment for order flow.  Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors, as well as any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

78.     Members of the Class are so numerous that their individual joinder herein is impracticable.  As of June 2019, Robinhood had approximately 9 million account holders.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by

mail and/or publication through the distribution records of Defendants.

79.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.  Whether the conduct and statements' of Robinhood officers, directors, and employees misrepresented material facts about Defendants' business and operations, including payment for order flow rates.
>
> B.  Whether federal securities laws were violated by Defendants' acts as alleged herein;
>
> C.  Whether Defendants' conduct violated consumer protection acts;
>
> D.  Whether Defendants' conduct constitutes a breach of its fiduciary duties; and
>
> E.  Whether Defendants' conduct constitutes a breach of its duty of best execution.

80.     The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, held an account with Robinhood and was subject to the same conduct and omissions by Defendants.  Plaintiff, like all other class members, was unaware of the unusually high payment for order flow rates negotiated by Defendants'.  Plaintiff, like all other class members, was unaware that such high payment for order flow rates materially affected the execution quality and opportunity for price improvement for Plaintiff's market orders.

81.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

82.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources

to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

83.     Plaintiff brings all claims in this action individually and on behalf of members of the Class against Defendants.

### COUNT I
### Violations of California Consumers Legal Remedies Act ("CLRA")
### Civil Code § 1750, *et seq.*

84.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.     Plaintiff brings this Count individually and on behalf of the Class.

86.     At all relevant times, the securities at issue herein constituted "goods," as that term is defined in Civ. Code § 1761(a).

87.     At all relevant times, Plaintiff and members of the Class were "consumers," as that term is defined in Civ. Code § 1761(d).

88.     At all relevant times, Defendants provided "services," as that term is defined in Civ. Code § 1761(b).

89.     At all relevant times, Plaintiff's purchases of stocks through Robinhood constituted "transactions," as that term is defined in Civ. Code § 1761(e).

90.     Defendants' acts, omissions, and statements described in this Complaint were intended to and did result in the sale or lease of services to consumers.  Defendants' acts, omissions, and statements violated the CLRA § 1750, *et seq.*, as described herein.

91.     Defendants' acts, omissions, and statements as alleged herein misrepresented that goods and services had characteristics or benefits which they do not have in violation of Civ. Code § 1770(a)(5).  Defendant violated this provision through (1) a lack of internal review concerning customer market order execution quality, (2) omissions related to Robinhood's unusually high payment for order flow rate, (3) misrepresentations that Robinhood's execution quality was comparable to its competitors, and (4) violating its duty of best execution by failing to seek best execution of customer orders.

92.     Defendants' acts, omissions, and statements as alleged herein represented that the goods were of a particular quality when they were in fact below that quality in violation of Civ. Code § 1770(a)(7).  Defendant violated this provision through (1) omissions related to Robinhood's unusually high payment for order flow rate, (2) misrepresentations that Robinhood's execution quality was comparable to its competitors, and (3) violating its duty of best execution by failing to seek best execution of customer orders.

93.     Defendants' advertised its Products with intent not to sell them as advertised in violation of Civ. Code § 1770(a)(9).  Defendants violated this provision because they knew that its execution quality for customer market orders was inferior to their competitors.

94.     Defendants' acts, omissions, and statements as alleged herein represented that the security transactions involved rights, remedies, and/or obligations which it does not have in violation of Civ. Code § 1770(a)(14).  Defendants violation this provision by representing that its securities were bought on behalf of clients at best execution when Defendants knew that they were not.

95.     Defendants' acts, omissions, and statements as alleged herein represented that the subject of a transaction had been supplied in accordance with a previous representation, when Defendants knew they were not, in violation of Civ. Code § 1770(a)(16).  Defendants' violated this provision by representing that Plaintiff and putative Class members market orders would be executed at best execution when Defendants' knew they would not be.

96.     Plaintiff and putative Class members were injured by Defendants' misrepresentations because Plaintiff and putative Class members would not have purchased the Products on the same terms, if at all, if they had known the true facts and Defendants' Products did not have the quality or value as promised.

97.     On or about the date of the filing of this action, Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations.  Attached hereto is a declaration on behalf of the Plaintiff pursuant to Cal. Civ. Code. § 1780(d).

98.     Plaintiff and members of the putative Class presently seek only injunctive relief under this Count.  If Defendants fail to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

**COUNT II**
**Violations of California Unfair Competition Law ("UCL")**
**Bus. & Prof. Code § 17200, *et seq.***

99.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

100.    Plaintiff brings this Count individually and on behalf of the putative Class.

101.    Defendant is subject to the UCL, Bus. & Prof. Code § 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or

fraudulent business practices and unfair, deceptive, untrue or misleading advertising…." The UCL also provides for injunctive relief and restitution for violations.

102.    Throughout the Class Period, Defendant committed unfair business acts and practices, as defined by § 17200, by using false and misleading statements to promote the sale of Defendants' Products, as described herein.

103.    Defendants' conduct is unfair in that the harm to Plaintiff and putative Class members arising from Defendants' conduct outweighs the utility, if any, of those practices.

104.    Defendants' conduct described herein, violated the "fraudulent" prong of the UCL by representing that its market execution quality was comparable to its competitors when it knew that it was not.

105.    Plaintiff and members of the putative Class have suffered injury and actual out of pocket losses as a result of Defendants' unfair, unlawful, and fraudulent business acts and practices because Plaintiff and putative Class members would not have purchased the Products on the same terms, if at all, if they had known the true facts that Defendants' Products did not have the quality or value as promised.

106.    Pursuant to *California Business & Professional Code* § 17203, Plaintiff and members of the putative Class are therefore entitled to: (a) an Order requiring Defendants to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendants as a result of their deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

1
2

## COUNT III
### Violations of California False Advertising Law ("FAL")
### Bus. & Prof. Code § 17500, *et seq.*

3      107.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set

4   forth herein.

5      108.    Plaintiff brings this Count individually and on behalf of the putative Class.

6      109.    California's FAL, (Bus. & Prof. Code § 17500, *et seq.*) makes it "unlawful for any

7

8   person to make or disseminate or cause to be made or disseminated before the public in this

9   state,…in any advertising device…or in any other manner or means whatever, including over the

10  Internet, any statement, concerning…personal property or services, professional or otherwise, or

11  performance or disposition thereof, which is untrue or misleading and which is known, or which by

12  the exercise of reasonable care should be known, to be untrue or misleading."

13     110.    Throughout the Class Period, Defendants committed acts of false advertising, as

14
15  defined by § 17500, by using false and misleading statements to promote services not provided as

16  advertised, as described herein.

17     111.    Defendants knew or should have known, through the exercise of reasonable care that

18  the statements were untrue and misleading.

19     112.    Defendants' actions in violation of § 17500 were false and misleading such that the

20  general public is and was likely to be deceived.

21     113.    As a direct and proximate result of these acts, consumers have been and are being

22
23  harmed.  Plaintiff brings this action pursuant to § 17535 for injunctive relief to enjoin the practices

24  described herein and to require Defendants to issue corrective statements and disclosures to

25  consumers.

26
27
28

## COUNT IV
### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

114.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.    Plaintiff brings this Count individually and on behalf of the putative Class.

116.    This Count is brought under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

117.    Section 10(b) provides, in pertinent part, "It shall be unlawful…[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary and appropriate in the public interest or for the protection of investors."

118.    Rule 10b-5 provides, in pertinent part, "It shall be unlawful…(a) [t]o employ any…scheme…to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

119.    Robinhood had a duty to disseminate timely, accurate, and truthful information with respect to its routing and execution quality of customer orders.

120.    Additionally, Defendants owed customers, like Plaintiff and members of the putative Class, a duty of best execution.  This duty required Defendants, as a broker-dealer, to seek the best price reasonably available for their customers' orders.

121.    During the Class Period, Defendants engaged in a scheme in which it knowingly or recklessly engaged in acts and practices which operated as fraud and/or deceit upon Plaintiff and

members of the putative Class by uniformly denying its customers best execution, including

opportunities for price improvement.

122.    During the Class period, Defendants made numerous untrue statements and omitted

material facts necessary to make the statements made not misleading in light of the circumstances

under which they were made.

123.    During the Class period, Defendants engaged in acts, practices, and courses of

conduct which operated as fraud and deceit upon its customers.  Such acts and practices include

negotiating unusually high payment for order flow rates with principal trading firms and, as a result,

routing and executing customer orders at inferior execution rates.

124.    Had Plaintiff and members of the putative Class been aware of Defendants scheme

they would not have chosen to open a brokerage account and execute market orders with

Robinhood.

125.    Defendants knew that by failing to provide its clients with the best execution for

their orders they would, and did, incur economic harm.  Such harm arose from Defendants

executing customers' trades at prices less favorable than the best price available, including chances

for price improvement.

126.    Pursuant to the aforementioned plan, scheme, and course of conduct, Defendants,

including senior Robinhood personnel, prepared and disseminated misleading statements and

reports to that were designed to convince the general public, including Plaintiff and putative Class

members, that Defendants were providing commission free trading while maintaining best

execution prices for their customers.  However, Defendants knew or should have known that this

was not true and did not disclose such information to the general public.  Such statements and

omissions were materially false and misleading.

127.    Such practices were undertaken by Robinhood, including senior Robinhood personnel, for the purpose of maximizing its payment for order flow, despite this practice violating Defendants' duty of best execution.

128.    During the Class Period, Plaintiff and members of the putative Class placed market orders through Robinhood with reasonable expectation of receiving best execution.  Such reasonable expectations were based on Defendants misleading statements and omissions as described herein, resulting in economic injury and damages.

129.     Defendants' scheme and course of conduct had a uniform effect on Plaintiff and members of the putative Class by routing customer orders through principal trading firms that Robinhood negotiated an unusually high payment for order flow, causing uniform inferior execution quality on those orders compared to the execution quality of other principal trading firms in the market.

130.    Defendants' scheme and course of conduct constituted a fraud on the market, as the price at which each stock was traded on Robinhood's platform was impacted due to Defendants' unusually high payment for order flow.

131.    Defendants' scheme and course of conduct as alleged herein violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

132.    During the Class Period, better prices were available to Plaintiff and putative Class members on each market order they placed, but these prices were not provided by Defendants.

133.    As a direct and proximate result of Defendants conduct, Plaintiff and members of the putative Class have suffered economic damages related to the allegations described herein.

## COUNT V
### Negligent Misrepresentation

134.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

135.    Plaintiff brings this Count individually and on behalf of the putative Class.

136.    Defendants represented to Plaintiff and Class members that Robinhood provides commission free trading at an execution price comparable to its competitors.  Such statements constitute material facts represented by Defendants to Plaintiff and members of the putative Class that Defendant knew or should have known was not true.

137.    Defendants, including senior Robinhood personnel, knew that these representations were not true, as they specifically negotiated unusually high payment for order flow rates with principal trading firms.  Defendants knew or should have known that its payment for order flow system resulted in inferior execution quality compared to its competitors.

138.    Defendants intentionally concealed, and removed, any information concerning their payment for order flow system.

139.    Defendants never intended to provide consumers commission free trading at execution prices comparable to its competitors.  Defendants knew or should have known that, due to its unusually high payment for order flow, its inferior execution quality typically exceeded the commission charged by its competitors.

140.    The principal trading firms could have offered Defendants' clients better execution quality, including the opportunity for price improvement, if not for Defendants' unusually high payment for order flow rates.

141.    Defendants marketed to the general public its commission free trading as a way to differentiate itself from competitors.  Defendants intended for Plaintiff and members of the putative Class to rely on such representations.

142.    Plaintiff and members of the putative Class suffered economic harm through the actions and conduct described herein.

143.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff and members of the putative Class have been damaged in an amount to be determined at trial.

## COUNT VI
### Breach of Implied Covenant of Good Faith and Fair Dealing

144.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

145.    Plaintiff brings this Count individually and on behalf of the putative Class.

146.    As described herein, Defendants charged unusually high payment for order flow rates at the expense of Plaintiff and Class members order execution quality.  In doing so, Defendants prioritized their own profits at the expense of its customers.

147.    Defendants intentionally concealed from Plaintiff and putative Class members any information regarding its payment for order flow system.

148.    Defendants unfairly interfered with Plaintiff's and Class members' rights to receive the full benefit of their trades on Defendants' platform.

149.    Defendants' conduct has breached the implied covenant of good faith and fair dealing because they have caused and continue to cause Plaintiff and putative Class members damages in an amount to be determined at trial.

## COUNT VII
### Breach of Fiduciary Duty

150.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

151.    Plaintiff brings this Count individually and on behalf of the putative Class.

152.    As a broker-dealer and provider of financial services, Defendants were fiduciaries to Plaintiff and members of the putative Class.  As such, Defendants owed them the highest good faith and integrity in performing financial services and acting as securities brokers on their behalf.

153.    As described herein, Defendants breached their fiduciary duties to Plaintiff and putative Class members by failing to provide adequate trade execution quality by prioritizing their own profits through an unusually high payment for order flow system at the expense of their customers.

154.    In breaching their fiduciary duty, Defendants' conduct has cause and continues to cause Plaintiff and putative class members economic damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order certifying the Class under Rule 23 and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated:  January 29, 2021

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Sarah N. Westcot*
　　　　　Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: swestcot@bursor.com
　　　　　sbeck@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Sarah Westcot, declare as follows:

1.      I am counsel for Plaintiff, and I am a partner at Bursor & Fisher, P.A.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      The complaint filed in this action is filed in the proper place for trial because Defendants because many of the acts and transactions giving rise to this action occurred in this District, and because Defendants reside in this District.

3.      Plaintiff Sarkhan Nabi is a resident of Tarzana, California.

4.      Both Defendant Robinhood Financial, LLC and Robinhood Securities, LLC are Delaware limited liability companies with its principal places of business located at 85 Willow Rd., City of Menlo Park, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on January 29, 2021 at Miami, Florida.


                                        /s/ *Sarah Westcot*
                                        Sarah N. Westcot